May it please the Court, Susan Saylor for the California Department of Fair Employment and Housing. I have here Claudia Senter who will be representing Mr. Corrado. I'd like to use five minutes of our time and cede the remaining. I would like to address exclusively the issue of whether there was diversity jurisdiction before the district court. Could you move the microphone just up a little if you could? Great. Thank you. It's the department's position that the district court erred in exercising diversity jurisdiction over the Department of Fair Employment and Housing because the state is not a citizen for the purposes of diversity under the 11th Amendment. The state is entitled to sovereign immunity from unconsented exercise of jurisdiction in the district court. In bringing this lawsuit, the state is exercising its quasi-sovereign interest in preventing and deterring unlawful disability discrimination within the state. The district court erred by relying on the Missouri Railway case, which has been limited by a modern line of cases in the district court, which recognize a quasi-sovereign state interest, therefore entitling the state to sovereign immunity when three factors are present, and all three factors were present in this case, where the underlying statute, in this case the Fair Employment and Housing Act, authorizes the state to bring suit in its own name and on its own behalf. But here, were you bringing it in your own name? Because the statute also said that, I guess Mr. Perrudo here was the real party in interest. How does that affect our analysis? If he's the real party in interest, why doesn't that make you a nominal party so we don't have to count you for diversity purposes?  A federal court must disregard the nominal or formal parties and rest jurisdiction only upon the citizenship of the real parties to the controversy. Because of the strength of the underlying state interest in eradicating unlawful disability-based discrimination within the state, that the state was truly the moving party because it had that quasi-sovereign interest in bringing the case. Okay. Mr. Corrado is the one who is allegedly discriminated against. His interest is formal, it seems. So the state has an interest. And it sounds to me that the way you see this is there can never be diversity jurisdiction in these cases because the presence of the state always destroys it. Even though there's diversity between Mr. Corrado, who this case is really about, and his employer. So that's the way it goes. This will always be decided in state courts. That's correct. That was the intent of the legislature in creating the Department of Fair Employment and Housing in prosecuting disability discrimination, all types of civil rights cases in the state because of the strong expression of state interest in eradicating disability. So the state can pass a law to basically change the federal law on diversity, federal jurisdiction on diversity. No. The 11th Amendment recognizes that when the state expresses its state sovereignty by empowering, for example, the Fair Employment and Housing Department or other similar... One would not apply. I guess I have the same question as Judge Rossani. The exception seems to swallow the rule here. Any time the state brings an action, your position is, I think at the end of the day, is there's no federal jurisdiction. No diversity, no, and the 11th Amendment would bar it otherwise. Not every time, Ron. Give us an example where you think it would apply. Where there's a strong expression of a sovereign state interest in the statute that empowers the state to... When would diversity... Can you give us an example of when you think diversity jurisdiction would exist when the state's a party in this type of circumstance? If the state is merely enforcing its own laws for the general welfare and not out of an important state interest, then diversity jurisdiction would apply. When would that be the case? Well, not in the case where there's a state administrative agency that's enforcing the civil rights laws of the state. Not in this instance. Now, there's some Supreme Court cases looking at this parents' patriae authority of the case, which I think is equivalent to what you referred to as the quasi-sovereignty. And they seem to indicate that the case should be brought on behalf of a large segment of the population. Here, there's a single individual. And I know that's how the statute is set up, the state statute, but for purposes of federal law, why shouldn't that make a difference? When the state is a party, but there's really only one person whose interests are at stake, and one person who's going to get recovery or any relief. Why doesn't that take you out of this quasi-sovereignty box? Because the state seeks broad, injunctive relief and takes ongoing enforcement efforts over the judgment or the settlement in the end so that the prospective relief that is gained through the lawsuit benefits many more people than just the individual. It protects the integrity of workplaces in California and keeps them free from discrimination. What's your position on Mr. Crudo's right to intervene? I'd like to allow my... No, I want the state's position before I hear... Okay. I know what Mr. Crudo's position is. He wants in. What's the state's position? The state's position is that we represent the state of California. The state is our client, and we welcome the partnership with the private bar. Under the FEHA, that intervention of the individual injured by discrimination is an intervention of right. Okay, thank you. Thank you. Can I ask just one more question? Sure. For the law that recognizes the position of state and parents' patrae for standing purposes, why is the same test applicable when we're judging diversity? Why are they equal in your view? It seems to me that's your view, isn't it? That if you have standing, you have... That the state has the same interest sufficient to destroy diversity. Why do you think that has to be the same test, standing and the test for this purpose? Our position is that when the state is acting as a state, it's entitled to sovereign immunity. That it's acting out of the interest of the state and not merely out of the interest of the individual. Not sure I answered your question. It's okay. Thank you. Yes, ma'am. Good morning. I'd like to submit on the briefing on the intervention issue, unless you all have questions on that matter. All right, thank you. And I'd like to reserve a minute and a half for Rebecca. All right. Under the Fair Employment and Housing Act and also the analogous federal disability non-discrimination statutes, the entire purpose of a reasonable accommodation leave is to enable the disabled worker to recover and return to work. The purpose isn't to terminate the individual at the end of the leave. The entire purpose of an effective accommodation is to enable that disabled worker to work successfully. And so in this case where the accommodation was cut off precipitously at the end, right when he's ready to go back to work, that vitiates that entire core purpose of the leave of absence, the reasonable accommodation. Similarly, the interactive process. These are pragmatic, functional concepts. The whole concept of the interactive process is to actually get the information. In this case, that process was cut off or Mr. Ecrata was terminated just at the point where the relevant information was coming in. They had scheduled the functional capacity evaluation. They were trying to figure out what the status of Mr. Ecrata's disability was in terms of whether he was able to return to work. So it vitiated that whole process by cutting it off based on the leave policy. So I'm looking for the generation material fact as to a violation of the statute. And from the employer's perspective, the employee, Mr. Crudo, said, here's what the doctors say. That's not. And the employer says, we don't have a position for that. That's not enough. But they say, no request on Mr. Crudo's part for meeting, for reasonable accommodation. No statements about what he could do or what he would want in order to return back. And then I guess the day after the termination of his one-year leave, he shows up and says, I'm ready to work. I think that what the record shows is that this is not a case where the worker disappeared during the leave. This is a case where Mr. Crudo communicated consistently and repeatedly with representatives of Lucent. He was directed to communicate with Ms. Utramala, and he did so repeatedly. I mean, he sends in his medical report. The doctor says I can only lift 20 pounds. Now it's only 10 pounds. Is that enough to trigger any response on the part of the employer other than what they did do, which was to investigate and research whether they had a job available for him? What was the genuine issue that they violated, the BHOP requirements? Well, let me answer in two parts. First of all, he did update Ms. Utramala and Claudine Strange, his line manager, periodically throughout the leave of absence and talked about developments and what he was doing to try and strengthen, meet with the trainer, lifting weights to get ready for the functional capacity evaluation. So this is not a person who disappeared and did not communicate. Secondly, what happened was that after the chiropractic treatments and the strengthening, he was released to return to work. He let line management know, and he let Ms. Utramala know before he was terminated. And before he was terminated, the functional capacity evaluation was scheduled. And so at that point, and the district court judge agreed, there was a triable issue of fact on whether he was qualified for purposes of the Fair Employment and Housing Act. And that's what the defendants moved on, elusive moved on that he wasn't qualified as a matter of law, and they lost that issue below. And so what was the evidence that he was qualified? Which was the information that he sent in? There's the January 17 release. There is the functional capacity evaluation. I can get you all these record sites if you want. The January 17, 2006 report filled in by Dr. Keisler Meza, the functional capacity evaluation which took place on January 31st, which also cleared him to return to work. There was also disputes in the evidence that the district court judge cited regarding what the actual lifting requirement was with respect to this particular job, as opposed to what was stated by the management of Lucent. And so there was a dispute about, you know, was it 100 pounds? Was it 50 pounds? He was actually cleared for 50 pounds on January 17. The problem, what she was concerned about, she had gotten these reports that he couldn't lift very much. Then finally at the very end she gets a report he can lift 50 pounds. But it has to be 50 pounds over a certain duration. And so she sought clarification from the doctor as to whether he really meant that after all this kind of decreasing poundage, he could suddenly do 50 pounds for 66% of the time or whatever. Right. And that's what she was seeking information on and couldn't get. Well, she did exactly the right thing. She said, I want more information. She asked the doctor and she scheduled the – But she couldn't get. Within the one year, which is the contractual period, she couldn't get the information back from the doctor. Well, she scheduled the functional capacity evaluation and she asked the doctor for more information. That's fine. But you can't then cut off the leave of absence that one year just because you have it written down that it's your policy. Well, he had the right to ask, or at least he could have, I don't know if it's in the rights, but he could have gotten a six-month extension if he was in this period where he was recovering, right? And he could have asked for six months, but he didn't do that. Well, at that point, when you have a functional capacity evaluation, you're on the phone with the doctor. It's closed for Martin Luther King Day. It's obvious that a few more days is going to be needed, A. B, the request for an extension was actually made by Ms. Utramallen and rejected by Mr. Corrado, who was in the line management. That's at Record Site 362. We will not be able to approve an LOA based on our current business need and past precedence. So even if he didn't ask, they said no. And third, if for some reason it was confusing and they terminated him and then found out he could have come back, there is case law, including Corrado, that says at that point they should have reconsidered and reinstated him once they got the correct information. Turning back to where Judge Akuta started on whether we have genuine issues of material facts and listening to your argument this morning, it strikes me that the essential facts are undisputed. The significance of the facts may be disputed. Is that right? We all know what the letters were. We all know what efforts he made. Is there anything that you would point to that's a disputed fact as opposed to how we interpret the facts? Well, I think the actual lifting requirement is disputed. There are different numbers that different witnesses stated. Right. But, I mean, we still have that. And so then there's disputes about the extent to which the lifting equipment and sort of safety procedures affect that. That's the deposition of Darrell Ruby. And we have some disputes about the extent to which Mr. Corrado was released. And we have the January 17, 50 pounds, January 31, 45 pounds, and maybe more. Very good. Any further questions? All right. Thank you. Thank you. Good morning. My name is Steve Blackburn. I am pleased to be here this morning representing the appellee, Lucent Technologies. And with me is Andrew Sommer of my office, who was heavily involved in the drafting of our brief. We need to start the clock a bit. Thank you. Go ahead. If it pleases the Court, I would like to focus most of my allotted time on the statutory failure to accommodate on discrimination issues that I think are at the heart of this case. There are four statutory claims at issue. The first cause of action contended that Lucent discriminated against Mr. Corrado because he had a disability when it terminated him in January 2006 after he had been off of work with full pay for an entire year and during that period of time had not been able to return to work. The district court found that summary judgment was appropriate on that case, on that claim, because the defendant had articulated a legitimate nondiscriminatory reason and the plaintiff had failed to articulate any evidence that sufficed as evidence of pretext. Well, there's a dispute over whether there's a pretext, right? There was the evidence about whether Lucent applied a new 100-pound lifting requirement to him. There's some testimony from Mr. Camacho that all of a sudden it's not 50 pounds, it's 100 pounds. Why couldn't a reasonable jury say, well, that's some evidence that they were just trying to get rid of him, not that they actually have this job requirement? Your Honor, I would submit to you that the appellee's assertion that there was a change in the job description at some point to increase the lifting requirement is simply not supported by the record. If the court goes to the pages of deposition that are cited in support of that proposition, there's long discussions about what the lifting requirement was, but there's absolutely nothing that can be reasonably read as an admission by any company representative that there was any modification of the job description. At best, it was an effort by the company representative to ensure that what was stated on the page about the job requirements of this job was accurate. It's simply not accurate for an appellee to assert that there was a change in the job description that might constitute evidence of pretext. In the Ninth Circuit, evidence of pretext has to be specific and clearly show that the articulative legitimate nondiscriminatory reason is false and or that the most more likely cause of what the employer did was discriminatory analyst. In this case, the appellees ruminate about a variety of things that they contend that Lucent could have done better or differently or treated Mr. Corrado more leniently. And of course, the accommodation process is inherently an imperfect one, and I can't stand up here and say that everything that Lucent did during the year-long process of trying to accommodate this individual was perfect. But there's nothing that the appellee has pointed to that would constitute viable evidence of pretext. They also raised the point that the nurse rescheduled the FCE. It was before he was terminated, and then it was mysteriously, according to opposing counsel, rescheduled after the date of termination. Nurse Jamal was, I think it's worth noting for that particular point, was not the person who made the decision to terminate Mr. Corrado's employment. That is undisputed. Her notes, her 19 pages of notes, which describe what she did on behalf of the company over the period of years to try to accommodate this individual in getting back to work, if you look at page 357, there is an entry on January 6th that comes as close as the functional capacity exam was scheduled and rescheduled. As I understand the references in the notes, and this was not made clear from Ms. Uttermohlen's deposition, as I understand the reference, she would schedule the FCE, the functional capacity exam, when and if Mr. Corrado's physician said he was able to return to work, with or without accommodation. At this point in time, or shortly thereafter, the company was getting a barrage of conflicting information from Mr. Corrado's physician, Dr. Kaisler-Messler, about exactly what this man's limitations were. For months, for the better part of the 12 months that he had been out of work with full pay, the restrictions had been stated as this individual can only lift 10 pounds and no more. That was not even close to what was needed to do the, a very physical job of the installer that he had done. That limitation stayed in place until January 17th, when suddenly, miraculously, when Mr. Corrado's year of paid leave was running out, he suddenly comes up with a release from Dr. Kaisler-Messler that seems to say that Mr. Corrado might be able to lift 50 pounds occasionally. And even that wasn't sufficient for the job, because the job made clear that he needed to lift 50 pounds frequently, carry a 50-pound weight for as long as 100 feet. Over the following days, the company received all sorts of different conflicting information from Dr. Kaisler-Messler about what this individual's limitations were. The last information that they received, and this is found in, on page 815 of the record, was a report that Dr. Kaisler-Messler submitted to the California Division of Workers' Compensation. And this report is submitted by the doctor under oath. This is the last word from Dr. Kaisler-Messler. And he tells the company that Mr. Corrado can lift more than 25 pounds. So are you saying that the contrary, that any information to the contrary, the January 17th report that opposing counsel points to in the later functional capacity exam where it did show he could carry 35 pounds, that that's not material, it isn't enough to make a material issue that should go to the jury in light of the overwhelming evidence to the contrary? Is that your position? I would say that my position is that that does not in any way establish pretext. It shows that there was a welter of different reports coming in from this doctor about what this man could do or couldn't do, and from different doctors. The functional capacity exam occurred after the termination decision had already been made. And the law of California is clear that an employer's obligation to reasonably accommodate a person's disability does not extend beyond the point in time where they have been terminated for a legitimate nondiscriminatory reason. So you're saying no reasonable jury could find pretext in light of this evidence so it doesn't create a jury issue? I don't believe it does. And again, I focus on the nature of what the evidence suggests. It suggests that there was confusion, that there was difference of opinion about what his limitations were, but it does not in any way suggest that the articulated legitimate nondiscriminatory reason was false or that the company was actually motivated by discriminatory animus. How about, could you turn to and discuss the interactive process and whether, how that's connected to what Are you referring, Your Honor, to the third cause of action where appellees contend that the employer failed to engage in the interactive process? Right. Your Honor, I must admit that I'm surprised that the Department takes the position on the record we have here that there was a failure to engage in the interactive process. That cause of action is intended to address the situation where the employer either leaps to a conclusion without any interaction between management and the employee that accommodation is impossible or just refuses to fulfill its obligation to engage in this give and take, back and forth exploration of possibilities. That was not the case here. This is perhaps the most substantive and detailed record of interaction, reasonable accommodation interaction that I have ever seen. It's 19 pages, can be found between 346 and 364 in the record. But what I was noticing from the record was he calls the nurse, the nurse talks to the employer, the employer says no, tells the nurse, then the nurse calls him back and says no. And so I was looking for some evidence that there was ever sitting down, meeting with decision makers and saying, here's what I can do, I could use assistive devices, I couldn't use assistive devices, it won't work, it won't work. And I didn't really see any of that. Well, one fact that looms large in this case and may have, obviously none of us were there, contributed to the decision to terminate being made when it was, was that at no point in time during the year that Mr. Corrado was out with full pay did he ever suggest even, and this is not disputed as the district court found or noted in its opinion. The plaintiff did not dispute this. At no time during that year when he was drawing full pay did Mr. Corrado ever indicate any desire to come back to work. I'd also point out that the obligation to engage in the interactive process does not guarantee success. This was a very difficult situation to reconcile this man's diminutive lifting capacity with a very strenuous physical job. And the fact that the company was never able to successfully accommodate him doesn't show that they didn't meet their obligation to engage in the interactive process. I think this record suggests a sterling effort by this employer not only to engage in the interactive process, but to create a record that they have engaged in the interactive process. And, Your Honor, I would, I would posit the question, if this is not sufficient for the employer to prove that it went through the process and the interactive process cause of action allows a plaintiff to attack the process, the employer simply didn't do enough, if this is not sufficient to satisfy the employer's obligation to go through that process, I can't imagine what might be. Now, there is one issue that goes through all of the statutory discrimination claims that I would like to make. With respect to the discrimination claim, I think it's clear that the employer established a legitimate nondiscriminatory reason. I believe the plaintiff is incorrect that this was a rigid application of a policy. As the Court has pointed out, as Judge Rustami pointed out, Mr. Corrado was entitled to a six-month extension of leave. He failed to apply for that. That is undisputed. So this wasn't a one-year-and-you're-out deal. But the issue that goes to all of the statutory claims is Mr. Corrado's inability to prove that he was a qualified individual. Now, as counsel pointed out, we did make that argument unsuccessfully in the district court. We argued that given the limitations that Mr. Corrado had on lifting, he simply wasn't a qualified individual, which is an absolute prerequisite to pursuing any sort of statutory claim under Feehoff. But isn't that one of the things in dispute? In other words, could he do the job with accommodations? And if that wasn't fully explored, or at least that's their position. I submit to Your Honor that, no, it's not in dispute because of – it's not in dispute in the record on appeal. The appeal record shows that the job description, which can be found in the record at 514 through 516, which the law of California recognizes in the absence of some evidence calling into question its validity, is the very best evidence that the court can have about what the requirements of a job are. This job description says that the installer needed to be able to lift 50 pounds over a distance of 100 feet on a frequent basis. It's defined as an essential function of the job. In the trial court, both parties submitted a variety of evidence either verifying 50 pounds as a lifting requirement or calling into question whether 50 pounds was actually required to be lifted on the job. In the record on appeal, though, there is a variety of declarations submitted by coworkers of Mr. Corrado, but there's virtually nothing that calls into question that that job description was not accurate when it said you have to be able to lift 50 pounds. There is virtually nothing, but there is something, right? There's a deposition of one of his coworkers and there's his own deposition. Your Honor, as I read the record, it's confined to Mr. Corrado's self-serving declaration, where even he says that he was required to lift on a regular basis 35 pounds. And again, I go back to, Your Honor, the last information that this employer had about what this man's lifting abilities were came on February 1, 2006, after the termination. His doctor said under oath this man can only lift 30 pounds. He, his own doctor, told, tells us through the record that this person was unable to lift the amount that Mr. Corrado himself admitted in his declaration he was required to lift on the job. And the plaintiffs have not identified any workable form of accommodation that would have made him able to do that. And so with or without accommodation, this man was not a qualified individual. And that is fatal to all of the statutory claims. Could you briefly address why the district court wasn't wrong in saying it had jurisdiction over the case, given that the FDH was a party? Well, obviously, Your Honor, I was hoping we wouldn't get to that because. Well, if you lose that one. Yes. I'm in big trouble if I lose that one. I would say, Your Honor, that Missouri Railroad is obviously still good law. This is a situation where the. But they say they're not a nominal party. I mean, Missouri Railroad, that was what it all turned on, was that it was a nominal party. Your Honor, I think it's very clear that Mr. Corrado is the only person who, as my father used to say, has a dog in his fight. He was the victim of the discrimination or failure to accommodate, if it occurred, the only victim. He is the only person that is going to benefit from any remedy that may come of this litigation. That remedy is going to come in the way of perhaps reinstatement and monetary damages. That is in no way going to inure to the larger benefit of the citizens of the state of California. He was designated. California was seeking injunctive relief against Lucent to improve their process. Your Honor, I would submit to you that that is a pro forma request for relief that would be expected in any action taken by the Department. And if that was sufficient, as you pointed out just a moment ago, it would convert every case that the Department of Fair Employment and Housing was involved in, into one where there could not be diversity by jurisdiction. An out-of-state corporation has a constitutional right to the benefits of diversity jurisdiction. And, of course, it goes back to protecting that out-of-state entity from local prejudice. And this is a classic example where that historical basis for diversity jurisdiction is exactly why this defendant, an appellee, saw it. I think that probably the greatest weakness, though, of the appellant's argument around diversity jurisdiction is the assertion that somehow or another, the Fair Employment and Housing Act could, by what's contained in there, deprive the federal court of diversity jurisdiction. I just don't think that there's anything, any way, that the state legislature could draft a statute that would say, okay, when our government agencies decide to take up an issue, be it against a citizen of the state or a non-citizen of the state, the federal courts can have nothing to do with it. But you're saying it's only if the state is acting as proprietary capacity? In other words, only if it's its own state lands or state – when would the state defeat diversity jurisdiction? Because I'm worried about going too far. Your argument goes too far in the other direction. Your Honor, it would have to involve some situation. And obviously the cases following Missouri Railroad have taken on – have involved a variety of very factual, intensive scenarios. But it has to involve a situation, in my view, where the state is not merely taking on a litigation in the same form, seeking the same relief that the private individual could have. We could be – What about a class action? Would you distinguish an action such as this, which involves one individual from a class of employees, for example? I would think so, yes, because that would certainly be much more likely to benefit the citizens of the state at large. And almost by definition, it wouldn't be a single citizen seeking relief. So any class action, any action that's a class action, Your Honor, Not necessarily any. But Judge Thomas asked me if, you know, class actions would be maybe closer to a situation where the state would be acting in the state's best interest. I can certainly see that the number of claimants, particularly when you get into a number of claimants, the numerosity that would be necessary to support a class action, it would certainly make the case look much less like an individual quarrel between Mr. Corrado and Lucent, like this one looks. Other citizens would have an interest in the proceedings. Very good. Any further questions? Thank you for your argument. Thank you. Ms. State, do you want a minute for a vote? No, I give my time to Mr. Corrado. All right, very good. We'll give you a minute and a half as you request it. Thank you. Just to highlight a few items. Mr. Corrado was cleared to lift 50 pounds on January 17th. That report was described by Dr. Keisler Meza as the most accurate of the reports. There were later reports that were confusing. But then the FCE was scheduled and held, actually, after he was terminated, which cleared Mr. Corrado to lift 45 pounds and perhaps more. These are found on pages 380, 357, 397 of the record. The nurse, Nurse Utraman, testified that the FCE gives the best approximation of actual abilities. So it's a tool to, in the interactive process, to figure out the information that you really need. And that's on page 343. In this case, Mr. Corrado tried to return. He communicated throughout the fall of 2005 about his progress. He would have returned if there had been a job that would have accommodated that, his lifting restrictions then. He provided the information on January 17th. He called on January 18th. He went to work on January 25th. And in the oral argument below, Counsel for Lucin acknowledged that they knew that he wanted to return to work. That's not what summary judgment could have or should have been granted on. I would also like to point out that, from our point of view, this is not a McDonnell Douglas kind of case. This is a case where Mr. Corrado was disabled and on a disability leave that's based on disability. The failure to reinstate was based on the employer's view of the limitations of the disability. The employer did not argue a legitimate non-discriminatory reason defense. And then even if it is a legitimate non-discriminatory reason, which I think is tricky because it's all about disability, there's a lot of evidence of pretext, including canceling that functional capacity evaluation, refusing to provide the short extension of leave. That would have been an obvious accommodation to just extend it out a couple of weeks until the FCE results came in. And that was denied by Manager Camacho at 362 in the Uttermalen chronology. So, yes, there's a lot of communication, but if it's all cut off and the person's terminated, right at the point where you're going to get all the information, that doesn't seem very functional to me. So I think that quantity is not the issue. The issue is how effective is it? Are you waiting to get the information you need to get? And if it came in after termination, there is law that says that I think the Ninth Circuit should adopt from the cases Corrado and Sears and Bultemeier, where even if the information comes in later, if something happens, that individual should be reinstated once that information is clarified. In this case, Mr. Corrado should not have been terminated. The extension should have been granted. That was an obvious accommodation under Norris, under Perlman, under all of our cases where we, you know, there was no secret as to what was going on. This should have been obvious to the employer. Thank you, counsel. Thank you. The case return will be submitted for decision.
judges: Restani, Thomas, Ikuta